UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PAMELA WILEY,

    *Plaintiff*,   CASE NO. 2:14-CV-12739-VAR-PTM

*v.*

COMMISSIONER OF   DISTRICT JUDGE VICTORIA A. ROBERTS
SOCIAL SECURITY,   MAGISTRATE JUDGE PATRICIA T. MORRIS

    *Defendant*.
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

### I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence does not support the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **GRANTED**, that Defendant's Motion for Summary Judgment be **DENIED**, and that the case be remanded to the Commissioner under sentence four of 42 U.S.C. § 405(g).

### II.    REPORT

#### A.    Introduction and Procedural History

This case was referred to Magistrate Judge Patricia T. Morris, *see* 28 U.S.C. § 636(b)(1)(B); E.D. Mich. LR 72.1(b)(3), by Notice of Reference to review the Commissioner's

---

[1] The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://www.uscourts.gov/RulesAndPolicies/JudiciaryPrivacyPolicy/March2008 RevisedPolicy.aspx. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

decision denying Plaintiff's claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). This matter is currently before the Court on cross-motions for summary judgment. (Docs. 9, 10.)

Plaintiff Pamela Wiley was almost forty-nine years old at the time of the administrative hearing on November 20, 2012. (Transcript, Doc. 9 at 31, 144.) Plaintiff worked as a health care aid for the thirteen years before her alleged disability onset date. (Tr. at 180.) Plaintiff filed her claims on September 29, 2011, alleging that she became unable to work on May 10, 2011. (Tr. at 144.) The claims were denied at the initial administrative stage. (Tr. at 61-62.) In denying Plaintiff's claims, the Commissioner considered symptomatic HIV infection and affective disorders (*Id.*) On November 20, 2012, Plaintiff appeared before Administrative Law Judge ("ALJ") Martha Gasparovich, who considered the application for benefits de novo. (Tr. at 31-60.) In a decision dated February 21, 2013, the ALJ found that Plaintiff was not disabled. (Tr. at 12-30.)

On May 13, 2014, the ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), when the Appeals Council denied Plaintiff's request for review. (Tr. at 1-6.) On July 14, 2014, Plaintiff filed the instant suit, seeking judicial review of the Commissioner's unfavorable decision. (Doc. 1.)

### B.     Standard of Review

The Social Security Administration has promulgated the following rules for the administration of disability benefits. *See* 20 C.F.R. §§ 401-422. First, a state agency, acting under the authority and supervision of the Administration, usually makes the initial determination of whether a person is disabled. 20 C.F.R. § 404.1503; *Bowen v. Yuckert*, 482 U.S. 137, 142 (1987). If denied, the claimant may seek review of the state's decision through

the Administration's three-stage review process. *Bowen*, 482 U.S. at 142. In the first step of this process, the state's disability determination is reconsidered de novo by the state agency. *Id.* Next the claimant has the right to a hearing before an ALJ. *Id.* Finally, "the claimant may seek review by the Appeals Council." *Id.* Only after the Commissioner has issued a final administrative decision that is unfavorable may the claimant file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decisions under 42 U.S.C. § 405(g). This is a limited review where we "'must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.'" *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (*quoting Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004); *see also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997).

### C. The ALJ's Five-Step Sequential Analysis

The "[c]laimant bears the burden of proving his [or her] entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994); *accord Bartyzel v. Comm'r of Soc. Sec.*, 74 F. App'x 515, 524 (6th Cir. 2003). While, in general, the claimant "is responsible for providing the evidence" to make a residual functional capacity ("RFC") assessment, before a determination of not disabled is made, the Commissioner is "responsible for developing [a claimant's] complete medical history, including arranging for a consultative examination[] if necessary." 20 C.F.R. § 404.1545(a)(3).

Title II, 42 U.S.C. §§ 401-434, provides DIB to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI, 42 U.S.C. §§ 1381-1385,

provides Supplemental Security Income ("SSI") to poverty-stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . .

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. § 416.905(a). Disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920; *see also Heston v.Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin,* 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by" an impairment that precludes performance of past relevant work. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003) (cited with approval in *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540 (6th Cir. 2007)). If the analysis reaches step five, the burden shifts to the Commissioner to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (citing 20 C.F.R. §§ 416.920(a)(4)(v), 416.920(a)(4)(g)); *see also Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006).

**D.     The ALJ's Findings**

The ALJ applied the five-step disability analysis to Plaintiff's claim and found at Step One that Plaintiff met the insured status requirements through March 31, 2014, and had not engaged in substantial gainful activity since May 10, 2011, the alleged onset date. (Tr. at 17.) At Step Two, the ALJ found that Plaintiff's conditions of pancreatitis, HIV infection, wasting syndrome, headaches, and depression secondary to general medical condition were "severe" within the meaning of 20 C.F.R. § 404.1520 and § 416.920. (*Id.*) At Step Three, she found that Plaintiff did not have an impairment or combination of impairments that met or was the medical equivalent of a listing in the regulations. (Tr. at 17-19.) At Step Four, she found that Plaintiff could perform light work with several limitations and was unable to perform any past relevant work. (Tr. at 19.) She also found that Plaintiff was forty-seven years old on the alleged onset date, putting her into the "younger individual" age range of eighteen to forty-nine years old. (Tr. at 25.) At Step Five the ALJ found that, considering Plaintiff's age, education, work

experience and RFC, there were jobs existing in the economy in significant numbers that Plaintiff could perform, and therefore Plaintiff was not disabled. (Tr. at 25-26.)

### E. Administrative Record

#### 1. Medical History

Plaintiff was infected with HIV and impregnated by her sexual partner in 1992. (Tr. at 222.) Plaintiff discontinued her HIV treatment when her five-year-old daughter died of AIDS in 1998. (Tr. at 263.) She resumed treatment briefly in 2005 and has been actively treating since September, 2011 (Tr. at 222, 257-84, 308-41.)

Plaintiff was treated at Sinai Grace Hospital from April 10, 2011 to January 11, 2013. (Tr. at 218-56, 308-41.) On April 12, 2011 Plaintiff complained of a rash on her lower back: she ranked the pain as an eight out of ten, and was diagnosed with shingles. (Tr. at 235.) She was discharged with a prescription for acyclovir and Vicodin. (Tr. at 237.) On August 10, 2011, Plaintiff complained of coughing and dehydration. (Tr. at 238.) She had not been eating or drinking. (*Id.*) She was diagnosed with acute bronchitis, she was given a prescription for Zithromax, her dehydration was treated with intravenous fluid, and she was released. (Tr. at 239-40.)

A chest x-ray from August 10, 2011 showed "[m]ultiple focal calcifications . . . in the region of the pancreas," which were likely related to chronic pancreatitis. (Tr. at 249.) On September 1, 2011, Plaintiff had a CT scan because of her headaches—there was "[n]o acute intracranial process . . . seen." (Tr. at 247-48.)

On September 1, 2011 she complained of headaches, weight loss, fatigue, and vomiting. (Tr. at 242-43.) The doctor's final impression was failure to thrive, acute-on-chronic pancreatitis, thrush, and headaches. (*Id.*) She was placed on an IV. (*Id.*) The most recent CD-4

6

count was 290 and was from 2009; the doctor feared Plaintiff's number had gotten much lower since then. (*Id.*) The doctor was also concerned about infections so he admitted Plaintiff to the hospital. (Tr. at 232.) She had lost ten pounds in the previous three weeks and currently weighed approximately 100 pounds and was 5'3" tall. (Tr. at 225, 232, 262) Dr. Wasif Hafeez was called in as a consultant and noted Plaintiff had been noncompliant with her HIV treatment since 1998 and that she "may be nearing AIDS" with its associated complications. (Tr. at 230.) He ordered a CD4 count and viral load. (Tr. at 223.) She was to follow up with him at an outpatient HIV clinic. (Tr. at 232.) The impression was acute pancreatitis, clinically improving; volume depletion, dehydration, HIV with no treatment, weight loss probably secondary to HIV, and "resolved" headaches. (Tr. at 233.) Her affect and mood were appropriate and she was alert and oriented. (Tr. at 220.) Plaintiff was discharged on September 3, 2011. (*Id.*)

Plaintiff consistently saw Dr. Hafeez starting in September, 2011. (Tr. at 257-84, 308-41.) He started Plaintiff on antiretroviral drugs to treat her HIV in September, 2011. (Tr. at 257.) Her CD4 count on April 23, 2009 had been 272 and on September 1, 2011 it was down to 210. (*Id.*) On September 28, 2011, Plaintiff was "doing very well," and complying with her HIV treatment; her CD4 was over 320 and she weighed 110 pounds. (Tr. at 268, 273.) On November 3, 2011 Plaintiff weighed 115 pounds and was complying with her medicine. (Tr. at 262.) However, on March 23, 2012, Plaintiff's HIV was "deteriorating"—she was only taking a half dose of some of her medicine because it caused abdominal cramping. (Tr. at 316.) She weighed 111 pounds. (*Id.*) Her medicine was modified and she was referred to a gastroenterologist to address her stomach problems. (*Id.*) On January 11, 2013, Plaintiff's HIV

7

was still "deteriorating," she was still reporting abdominal pain, and she weighed 115 pounds. (Tr. at 313.)

During her intake with Dr. Hafeez, Plaintiff also reported a history of depression with suicidal and homicidal thoughts. (Tr. at 266.) She was depressed with an appropriate mood and a flat affect. (Tr. at 272.) Her recent and remote memory were intact and she was oriented to time, place, and person. (*Id.*) Her judgment and insight were appropriate. (*Id.*) Plaintiff consistently reported depression at her appointments with Dr. Hafeez and was referred to behavioral health. (Tr. at 218-56, 308-41.) As of January 11, 2013, Plaintiff was still depressed and positive for suicidal and homicidal ideation. (Tr. at 314.)

Plaintiff was treated by licensed social worker, Matt Sweet, a few times in November 2011. (Tr. at 285.) She was "seeking behavioral health services to cope with depression and grief." (*Id.*) Plaintiff was assessed with a Global Assessment of Functioning ("GAF") score of 50-55.[2]

On November 26, 2011 Plaintiff saw Dr. Nick Boneff for a mental consultative examination. (Tr. at 287-92.) Plaintiff was not taking any psychiatric medication at this time. (*Id.*) Dr. Boneff assessed Plaintiff with a GAF score of 51. (*Id.*) Dr. Boneff stated,

> the claimant demonstrated only moderate strengths in concentration . . . . She displayed some capacity for abstract thinking and a general intact cap[ac]ity for judgment and impulse control. She would appear capable of engaging in work type activities of a relatively simple nature, remembering and executing a 3 or 4 step repetitive procedure on a sustained basis with little in the way of independent judgment or decision making required.

---

[2] According to the fourth edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM"), a GAF score of fifty-one to sixty indicates, "[m]oderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers)." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., text rev. 2000) [hereinafter *DSM-IV*]. The fifth edition of the DSM, however, rejects the use of GAF scores altogether. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed., 2013).

(*Id.*)

On November 5, 2012, Plaintiff had a mental RFC assessment by Dr. Inyang.[3] Dr. Inyang assessed Plaintiff with a GAF score of 50.[4] (Tr. at 293-97.) Plaintiff reported feeling depressed, hopeless, and lonely. (*Id.*) She was taking Zoloft and Remeron to treat her depression, and she reported side effects of drowsiness, upset stomach, and lethargy. (*Id.*) She also had difficulty concentrating and was experiencing sleep disturbances. (*Id.*) Dr. Inyang indicated that Plaintiff's impairments would cause her to be absent from work more than four days per month and concluded that she was not malingering. (*Id.*)

    **2.**    **Adult Function Report**

In her adult function report, Plaintiff reported that from the time she woke up until the time she went to sleep, she had breakfast, watched television, listened to the radio, and spent most of the day resting. (Tr. at 191.) She did not provide care for any other person or for any pets. (Tr. at 192.) Most nights her back pain caused her to get very little sleep. (Tr. at 192.) She did not have any problems with her personal care. (*Id.*) She cooked simple meals for herself, which typically took twenty to thirty minutes to prepare. (Tr. at 193.) She washed her own laundry and dishes. (Tr. at 193.) Her family would often come over to help her with housework. (*Id.*) She went to the store once or twice a week. (Tr. at 194.) Her hobbies included reading and watching television. (Tr. at 195.) She would sometimes spend time talking to people on the phone, about two to three times a week, and she also attended church on Sundays. (*Id.*) She did not report problems getting along with others. (Tr. at 196.) Her

---

[3] In the report, Dr. Inyang stated he had only seen Plaintiff once, but at the administrative hearing, Plaintiff testified that she saw Dr. Inyang three times, explaining that she was unable to get any other records. (Tr. at 50, 293-97.)

[4] A GAF score of 41-50 indicated "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *DSM-IV*, *supra* at 34.

condition caused problems lifting, bending, reaching, and walking. (*Id.*) She could walk for about a half mile before taking a five to ten minute break. (*Id.*) She was able to pay attention for only short amounts of time, she did not finish what she started, and she could follow spoken instructions well. (*Id.*) She got along well with authority figures, she had never been laid off from a job for not getting along with others, she did not handle stress well, and she could only handle very simple changes in her routine. (Tr. at 196-97.)

### 3. Plaintiff's Testimony at Administrative Hearing

At the administrative hearing, Plaintiff testified that she stopped working in 2011 because she became very sick, lost a lot of weight, and became very fragile. (Tr. at 37.) She testified she went from 135 pounds down to 90 pounds within five months. (*Id.*) She said her medications cause dizziness, headaches, vomiting, and diarrhea. (Tr. at 38.) She had headaches about three or four times a week. (Tr. at 39.)

Plaintiff testified she could stand for no more than a half hour before she would get dizzy. (Tr. at 40.) She could not sit for extended periods of time, and she could only lift three or four pounds. (*Id.*) She was living with her sister at the time of the hearing and did not do any housework. (*Id.*) She had problems sleeping because her depression caused her to toss and turn all night. (Tr. at 41.) Her energy level was usually "very low" during the day. (Tr. at 42.) Her depression caused crying spells at least three or four times a week. (*Id.*)

Her pancreatitis caused her significant abdominal pain. (Tr. at 44.) She took pain medicine to treat it, which provided some relief, but she had to lie down for a few hours after taking the pain medicine. (Tr. at 44-45.) She took Zoloft for the depression, which seemed to help, but not much. (Tr. at 45-56.) Her concentration was very poor. (Tr. at 47-48.)

### 4. Vocational Expert Testimony at Administrative Hearing

The ALJ asked the Vocational Expert ("VE") a series of hypothetical questions based on an individual with the same age, education, and work experience as the Plaintiff. (Tr. at 55-59.) For the first hypothetical, the ALJ asked the VE to assume that the individual was able to

> stand and walk no more than six hours in an eight hour day. The individual could lift no more than 20 pounds occasionally and 10 pounds frequently. Could only squat, crawl, kneel, climb, balance, bend or stoop occasionally. Would be limited to simple, routine, one to three step tasks in a low stress environment defined as no quick decision making and no quick judgment required on the job. There could be no interaction with the public and only occasional interaction with co-workers. And all work must be performed in a non-production pace setting.

(Tr. at 56-57 [sic throughout].) The VE stated that the individual would not be able to perform any of Plaintiff's previous work. (Tr. at 57.) There would be jobs available to the individual, however: The individual could perform work in cleaning (3500 jobs in the region), and in simple assembly and machine tending (6500 jobs in the region). (*Id.*) Employment would be precluded if the individual were off task occasionally (one-third of the day), took unscheduled breaks at least once a day for at least thirty to forty-five minutes, or had more than two absences a month. (Tr. at 57-58.)

### F. Governing Law and Analysis

#### 1. Legal Standard

The ALJ determined that Plaintiff had the RFC

> to perform light work as defined in [the regulations], as the claimant is capable of standing and walking no more than six hours in an eight-hour workday, and lifting no more than 20 pounds occasionally and 10 pounds frequently. The claimant, however, can only occasionally squat, crawl, kneel, climb, balance, bend, or stoop. The claimant is limited to simple, routine, one to three step tasks in a low stress environment defined as no quick decision making and no quick judgment required on the job. The claimant is restricted to no interaction with the public and only occasional interaction with co-workers. All work must be performed in a non-production pace setting.

11

(Tr. at 19.) The regulations define light work as involving

> lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

### 2.     Substantial Evidence

In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *see also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). A reviewing court must consider the evidence in the record as a whole, including any evidence that might subtract from the weight of the Commissioner's factual findings. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("'[A]n ALJ can consider all the evidence without directly addressing in his [or her] written decision every piece of evidence submitted by a party.'" (quoting *Loral Defense Systems-*

12

*Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999)); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006)).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "'there exists in the record substantial evidence to support a different conclusion.'" *McClanahan*, 474 F.3d at 833 (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)); *see also Mullen*, 800 F.2d at 545. Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994); *see also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a '"zone of choice"' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (quoting *Mullen*, 800 F.2d at 545).

### a. Step Three Governing Law

"Under a theory of presumptive disability," Step Three of the SSA's five-step sequential evaluation process requires the ALJ to analyze whether a severe impairment meets or is medically equivalent to one of the listed impairments; if so, the claimant is presumed disabled and the sequential evaluation terminates. *Christephore v. Commissioner of Social Security*, 11-13547, 2012 WL 2274328 at *6 (E.D. Mich. June 18, 2012) (citing *Reynolds v. Commissioner of Social Security*, 424 Fed. App'x 411, 416 (6th Cir. 2011)); 20 C.F.R. §§ 404.1520. In order to facilitate meaningful review, an ALJ must analyze a claimant's impairments under this step and give a reasoned explanation of the resultant findings. *Reynolds*, 424 Fed. Appx. at 416. An ALJ that fails to undertake a detailed Step Three analysis has erred; further, the error is not

harmless because the claimant might be presumed disabled with no need of any functional analysis at Steps Four and Five. *Id.* The rule that an ALJ "evaluate the evidence," compare it to the Listing, and "give an explained conclusion" is "prudential and not jurisdictional"–it is impossible to determine whether substantial evidence supports an ALJ's determination without this analysis. *Id.* And because the requirement is prudential a Plaintiff cannot waive this argument by not raising it. *Id.*

However, an ALJ is not required to consider every Listing or to consider Listings that claimants "clearly do[] not meet." *Sheeks v. Commissioner of Social Security Administration*, 554 Fed. App'x 639, 641 (6th Cir. 2013). The claimant carries the burden of proof at Step Three and therefore, as the Third Circuit has observed, the ALJ's analysis does not need to be extensive if the claimant fails to produce evidence that he or she meets the Listing. *Ballardo v. Barnhart*, 68 F. App'x 337, 339 (3d Cir. 2003) (finding that a conclusory, single-sentence analysis was adequate where the claimant "presented essentially no medical evidence of a severe impairment"). Consequently, an ALJ's Listing analysis must always be viewed in light of the evidence the claimant presents.

### b.  *Relevant Listings and Analysis*

HIV is listed as a subcategory of Immune System Disorders in the Listing of Impairments found in 20 C.F.R. Part 404, subpart P, Appendix 1 § 14.08. In addition to requiring proper documentation of HIV, Section 14.08 requires any one of the enumerated additional components listed as sections 14.08A-J.

> Listing 14.08H, contemplates HIV wasting syndrome and requires,
>
> involuntary weight loss of 10 percent or more of baseline (computed based on pounds, kilograms, or body mass index (BMI)) or other significant involuntary weight loss as described in 14.00F5, and in the absence of a concurrent illness that could explain the findings. With either:

1. Chronic diarrhea with two or more loose stools daily lasting for 1 month or longer; or
2. Chronic weakness and documented fever greater than . . . ($100.4^o$ F) for the majority of 1 month or longer.

20 C.F.R. Part 404, subpart P, Appendix 1 § 14.08H. "For purposes of 14.08H, an involuntary weight loss of at least 10 percent of baseline is always considered 'significant.'" Loss of less than 10 percent may or may not be significant, depending on the individual's baseline weight and body habitus." *Id.*

At Step Three, the ALJ found,

> In determining whether the claimant's physical impairments meet or equal the Listings, I have considered Listings 5.08 (weight loss due to any digestive disorder) and 14.08 (HIV infection). The medical evidence does not document listing-level severity, and no acceptable medical source has mentioned findings equivalent in severity to the criteria of any listed impairment, individually or in combination.

(Tr. at 18.) The ALJ then addressed Plaintiff's mental impairments. She found that Plaintiff had moderate restrictions in activities of daily living; in social functioning; and in concentration, persistence, or pace. (Tr. at 18-19.) She had not experienced any episodes of decompensation and met none of the "paragraph C" criteria. (*Id.*)

Plaintiff argues, "The ALJ did not properly evaluate Plaintiff's impairments under the third step . . . ." (Doc. 12 at 14.) She complains that the ALJ did not evaluate any of her impairments under the Listings and that she meets listing 14.08, specifically 14.08H for wasting syndrome. (*Id.*)

I suggest that the ALJ's conclusory analysis was not appropriate because Plaintiff produced evidence consistent with the Listing requirements. *See Ballardo*, 68 F. App'x at 339. Instead, because Plaintiff has shown that Listing 14.08H was implicated, the ALJ was required to provide a reasoned explanation of the resultant findings. *See Reynolds*, 424 Fed. Appx. at

15

416. The ALJ was required to analyze whether Plaintiff's weight loss was significant. *See* (Tr. at 225, 232.) Additionally, because the record shows that Plaintiff consistently experienced diarrhea and fatigue, *see* (Doc. 38, 242-43), the ALJ also should have specifically analyzed whether these symptoms met the requirements of 14.08H.

Further, I suggest that even if the ALJ had found, after a thorough analysis, that Plaintiff did not meet Listing 14.08H, she should have done the analysis required by Section 14.00G. Section 14.00G1 states that "[i]f your impairment does not otherwise meet the requirements of a listing, we will consider your medical treatment in terms of its effectiveness in improving the signs, symptoms, and laboratory abnormalities of your specific immune system disorder or its manifestations, and in terms of any side effects that limit your functioning." 20 C.F.R. Part 404, subpart P, Appendix 1 § 14.00G. Section 14.00G5 specifically lays out how an ALJ is to "evaluate the effects of treatment for HIV infection on [the claimant's] ability to function":

> When we consider effects of antiretroviral drugs . . . and the effects of treatments for the manifestations of HIV infection on your ability to function, we consider the factors in 14.00G1 and 14.00G2. Side effects of antiretroviral drugs include, but are not limited to: Bone marrow suppression, pancreatitis, [and] gastrointestinal intolerance (nausea, vomiting, diarrhea) . . . . In addition, medications used in the treatment of HIV may also have effects on mental functioning, including cognition (for example, memory), concentration, and mood, and may result in malaise, severe fatigue, joint and muscle pain, and insomnia. . . . We will consider all of your functional limitations, whether they result from your symptoms or signs of HIV infection or the side effects of your treatment.

*Id.* § 14.00G5. In light of Plaintiff's chronic pancreatitis (Tr. at 44, 233, 242-43, 249), her gastrointestinal symptoms of nausea, vomiting, and diarrhea (Tr. at 38, 242-43), her consistent complaints of depression (Tr. at 266, 257-84, 314), and her problems concentrating (Tr. at 293-97), I suggest the ALJ was required to provide a thorough Section 14.00G analysis. *See Milien*

*v. Astrue*, No. 10-cv-2447, 2010 WL 5232978, *7 (E.D.N.Y. Dec. 16, 2010) (finding that the ALJ should have considered and given equal weight to the plaintiff's fatigue along with all the HIV-related symptoms, especially considering fatigue was explicitly contemplated by Listing 14.000G5(a)).

Further, I suggest that the ALJ erred by not relying on an expert medical opinion for her medical equivalency determination. Medical equivalency determinations are treated differently from whether a claimant meets a listing. *Fowler v. Comm'r of Soc. Sec.*, No. 12-12637, 2013 WL 5372883, at *12 (E.D. Mich. Sept. 25, 2013). Social Security Ruling 96-6p states, that "longstanding policy requires that the judgment of a physician (or psychologist) designated by the commissioner on the issue of equivalence on the evidence before the [ALJ] . . . must be received into the record as expert opinion evidence and given appropriate weight." 1996 WL 374180, at *3. "Whether a claimant's impairment equals a listing is a medical judgment, and an ALJ must consider an expert's opinion on the issue." *Fowler*, 2013 WL 5372883, at *12 (citing *Barnett v. Barnhart*, 381 F.3d. 664, 670 (7th Cir. 2004)). According to the Sixth Circuit, "Generally, the opinion of a medical expert is required before a determination of medical equivalence is made." *Retka v. Comm'r of Soc. Sec.*, 1995 WL 697215, at *2 (6th Cir. 1995). The need for an expert opinion can be met with a signature on a Disability Determination Transmittal Form. *Hayes v. Comm'r of Soc. Sec.*, No. 11-14596, 2013 WL 766180, at *9 (E.D. Mich. Feb. 4, 2013) *report and recommendation adopted*, 2013 WL 773017 (E.D. Mich. Feb. 28, 2013).

While it is true that the record contains a Disability Determination Transmittal Form, signed by Dr. Barbara Jones Smith, Ph.D., (Tr. at 68), I suggest that the ALJ should have pointed to and evaluated the weight to accord to this opinion. However, the ALJ merely found

that "[n]o acceptable medical source has mentioned findings equivalent in severity to the criteria of any listed impairment, individually or in combination." (Tr. at 18.) She did not even cite to Dr. Jones Smith's bare assertion that Listing 14.08 had been considered and an RFC assessment was necessary. (Tr. at 68.)

### G. Conclusion

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is not supported by substantial evidence. Therefore, the case should be remanded under sentence four of 42 U.S.C. § 405 (g) to the Commissioner to undertake the proper Listings 14.00G and 14.08H analysis and to gather expert medical opinion evidence on whether Plaintiff's impairment or combination of impairments medically equaled the severity of a Listing.

### III. REVIEW

Rule 72(b)(2) of the Federal Rules of Civil Procedure states that "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 155; *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit*

*Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). According to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: April 17, 2015                    S/ PATRICIA T. MORRIS
                                        Patricia T. Morris
                                        United States Magistrate Judge

### CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: April 17, 2015                    By s/Kristen Krawczyk
                                        Case Manager to Magistrate Judge Morris